# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

| | |
|---|---|
| CYNTHIA AUSTIN | CIVIL NUMBER 5:17-CV-01625 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| INDUSTRIAL OILS UNLIMITED, LLC | MAGISTRATE JUDGE HAYES |

<u>MEMORANDUM IN OPPOSITION TO DEFENDANT'S AND COUNTER CLAIMANTS' MOTION AND MEMORANDUM FOR SUMMARY JUDGMENT</u>

Respectfully submitted:

KAMMER & HUCKABAY, LTD. (A.P.L.C.)

CHARLES H. KAMMER, III
Bar Roll No. 21658
820 Jordan Street, Suite 480
Shreveport, Louisiana 71101
(318) 222-0293 Telephone
pete@kandhlawoffice.com
ATTORNEY OF CYNTHIA AUSTIN

## TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LAW AND ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.  Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.  Louisiana Law on Non-Solicitation Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      C.  The Validity of the Non-Solicitation Agreement outside of 23:921. . . . . . . . . . . . . . . . 13

      D.  Paragraph 3 Non-Disclosure of Confidential Information is null and void under Louisiana Revised Statute § 23:921. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      E.  The Non-Solicitation Agreement is null and void because the Agreement is overly broad and ambiguous when it extends to other parties not part of the Agreement. . . . . . . . . . 18

      F.  The definition of Company's business is overly broad. . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**TABLE OF AUTHORITIES**

**Statutory Authority**

La. R.S. § 23:921. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 12, 13, 17, 18, 19, 20, 22, 24

La. C.C. art. 1765. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

La. C.C. art. 1766. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

La. C.C. art. 1984. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Federal Rule of Civil Procedure 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

**Jurisprudential Authority**

*Action Revenue Recovery, L.L.C. v. eBusiness Grp., L.L.C.,*
    17 So.3d 999, 1003 (La.Ct.App. 2d Cir.2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*All American Healthcare, LLC and Dichiara,*
    263 So.3d 922 (La. Ct. App. 5th Cir. 2018).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Aon Risk Servs. of La., Inc. v. Ryan,*
    807 So.2d 1058, 1062 (La.Ct.App. 4th 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Baton Rouge Computer Sales, Inc. v. Miller-Conrad,* 1999-2000
    (La. App. 1 Cir. 5/23/00), 767 So.2d 763. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Brock Services, L.L.C., v. Rogillio,* 2019 WL 4023825 (5th Cir. 2019). . . . . . . . . . . . . . . . . . . . 13

*Bruckner Truck Sales, Inc. v. Bayou Diesel Servs., LLC,* No. 2:17-CV-0204,
    2017 WL 10152283, at *7–8 (N.D. Tex. Nov. 21, 2017). . . . . . . . . . . . . . . . . . . . . . . 13, 18

*Cable & Connector Warehouse, Inc. v. Omnimark, Inc.,*
    700 So. 2d 1273 (La. Ct. App. 4th Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Daiquiri's III on Bourbon, Ltd. V. Wandfluh,*
    608 So.2d 222 (La. App. 5 Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21

*Henderson Implement Co., Inc. v. Langley,*
    707 So. 2d 482 (La. Ct. App. 3d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Jeansonne v. El Hindy,* 413 So. 2d 999 (La. Ct. App. 4th Cir. 1982). . . . . . . . . . . . . . . . . . . 19, 20

*Johnson Controls, Inc. v. Guidry,*

724 F.Supp.2d 612, 622 (W.D.La. July 12, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*LaFourche Speech & Language Servs., Inc. v. Juckett*,
      1994-1809 (La. App. 1 Cir. 3/3/95), 652 So.2d 679 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Louisiana Office Systems, Inc. v. Boudreaux*,
      298 So. 2d 341 (La. Ct. App. 3d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Louisiana Smoked Prod., Inc. v. Savoie's Sausage & Food Prod., Inc.*,
      696 So.2d 1373, 1381 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Medical Staffing Network, Inc. v. Ridgway*,
      194 N.C. App. 649, 670 S.E.2d 321 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*NAB Natural Resources, L.L.C. v. Willamette Industries, Inc.*,
      28,555 (La.App.2d Cir.8/21/96), 679 So.2d 477. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*O'Sullivan v. Sunil Gupta, M.D., LLC,* No. CV 17-609,
      2017 WL 3438349, at *4 (E.D. La. Aug. 10, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Paradigm health Sys., L.L.C. v. Faust*,
      2016-1276, 2017 WL 1379096 (La. App. 1 Cir. 4/12/17). . . . . . . . . . . . . . . . . . . . . . . 21

*Reg'l Urology, L.L.C. v. Price*, 42,789 (La. App. 2 Cir. 9/26/07),
      966 So. 2d 1087, 1091–92 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*ScenicLand Construction Co., L.L.C. v. St. Francis Medical Center, Inc.*,
      41,147 (La.App.2d Cir.7/26/06), 936 So2d 251. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Summit Inst. For Pulmonary Med. And Rehabilitation, Inc. v. Prouty*,
      29,829 (La. App. 2 Cir. 4/9/97), 691 So.2d 1384. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*SWAT 24 Shreveport Bossier, Inc. v. Bond*, 2000-1695
      (La. 6/29/01), 80[8] So.2d 294. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Thomas v. McCrery*, 147 So. 2d 467 (La. Ct. App. 2d Cir. 1962). . . . . . . . . . . . . . . . . . . . . 19

*Ticheli v. John H. Carter Co., Inc.*, 43,551
      (La. App. 2 Cir. 9/17/08), 996 So.2d 437. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*United States v. Cytogel Pharma, LLC,* No. CV 16-13987,
      2018 WL 4462183, at *3 (E.D. La. Sept. 17, 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Vartech Sys. v. Hayden*, 951 So. 2d 247, 256 (La. App. 1st Cir. 2006) . . . . . . . . . . . . . . . . . 13, 22

*Waguespack v. Medtronic*, 185 F.Supp.3d 916 (M.D. La. 2016). . . . . . . . . . . . . . . . . . . . . . 11, 20

*Water Processing Technologies, Inc. v. Ridgeway*,
        618 So. 2d 533, 535 (La. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

**CYNTHIA AUSTIN**                           **CIVIL NUMBER 5:17-CV-01625**

**VERSUS**                                   **JUDGE S. MAURICE HICKS, JR.**

**INDUSTRIAL OILS UNLIMITED, LLC**           **MAGISTRATE JUDGE HAYES**

<u>**OPPOSITION TO DEFENDANT'S AND COUNTERCLAIMANTS' MOTION**
**AND MEMORANDUM FOR SUMMARY JUDGMENT**</u>

NOW INTO COURT comes CYNTHIA AUSTIN, plaintiff herein, being represented by Charles H. Kammer, III, who respectfully requests that this Court dismiss the Summary Judgment as set forth below:

MAY IT PLEASE THE COURT:

## I. FACTUAL BACKGROUND

Cynthia Austin was hired by Industrial Oils on or about January 18, 1999. Exh. G. Industrial Oils is considered a blender. Exh. G. A blender formulates/mixes their own oil using raw materials bought from a refinery. Exh. G. A blender would add base stock and additives. Exh. G. Industrial Oils only sold their products in large quantities, such as oil in transport loads (7500 gal), bulk (250 gallons and up), drum (55 gallons), pails (5 gallons), kegs (120lb), and tubes (50 tubes to a master pack) product. Exh. G. Industrial Oils does not sell their product in case goods such as quarts, gallons and liters. Exh. G. They sell their products to distributers, who subsequently resells their products to end users. Exh. G. Industrial Oils also sells to end users, but only certain products in large quantities and limited areas. Exh. G.

A distributer buys oil from companies like Industrial Oils and resells the oil to end users as

1

their own oil.  Exh. G.  The distributers also sell other products that Industrial Oils does not sell.

Exh. G.  These product groups are chemicals, oils, cleaners, diesel (which consist of gas, on road and

off road) and DEF.  Exh. G.  Industrial Oils does not sell all oil products such as DEF, parts cleaner,

brake fluid cleaner, gasoline additive, fuel, on and off-road diesel.  Exh. G.  This limits their

competition in the market with other oil companies.  Exh. G.  Industrial Oils products are: oil/grease

( which consists of hydraulic, motor, anti freeze, grease, coolants, all which are not name brand by

generic), some cleaners and floor dry.  Exh. G.  Furthermore, Industrial Oils only sells it's brand

name products.  Exh. G.  It competes with other brand name companies such as Exxon, Mobil, Shell,

Royal Purple, Chevron.  Exh. G.  Some distributors are exclusive distributors for a major branded

oil, such as Mobil.  Exh. G.  For example, Lott Oil is the exclusive distributor for Exxon Mobil so

all of the accounts that are factory filled with Mobil Oil in the Shreveport Bossier areas will only do

business with Lott Oil.  Exh. G.

There are never any agreements between the customer and the vendor.  Exh. G.  Businesses

are not bound to use one oil company.  Exh. G.  A company could use whichever oil company they

wanted to on their next purchase.  Exh. G.  Sometimes businesses would use several companies for

their oil needs, which is common in the oil industry.  Exh. G.  For example, ABC Company may buy

engine oil from Industrial Oils and hydraulic oil from Lott Oil and grease from Auto Zone.  Exh. G.

Purchasing departments are very well known for shopping around for price.  Exh. G.  ABC Company

could shop price for all their oil products and not ever use the same company twice.  Exh. G.

The scope of Industrial Oils territory additionally limits their market.  Exh. G.  Industrial Oils

is limited to their service area, which includes some parts of Louisiana, Texas, Oklahoma, and

Arkansas.  Exh. G.  If Industrial Oils called on a corporate company like Baker Hughes, for instance.

Exh. G.  Industrial Oils would not be able to compete with some of the major oil brand companies, who are in all of the service areas for Baker Hughes.  Exh. G.

The potential end users are the neighborhood lawn mowing company, the local farmer, gas stations, chain saw repair shops, construction companies, Wal-Mart, car dealerships, oil field companies, DOTD, manufacturing companies, "mom and pop" companies, welding companies, mining and tree cutting services.  Exh. G.  The list of end users would include any individual or company who uses vehicles, equipment, machinery or any company who services vehicles, equipment, machinery or etc.  Exh. G.  The list is endless.

Every oil company has it's own different special niche as to what type of market they target. Exh. G.  Industrial Oils targets the oilfield market and natural gas market.  Exh. G.  They do not and can not compete with the automotive market such as car dealership, oil change business, convenience stores and car wash businesses, because they do not sell oil in the specific containers that these businesses use.  Exh. G.  Industrial Oils does not sell fuel, on road or off-road diesel or DEF (diesel exhaust fluid) which makes them not a player in that market either.  Industrials Oils is not what you call a full-service oil company like Lott Oil, Reladyne or Stegall, O'Rouke.  Exh. G.

Cynthia Austin was hired as a Sales Representative.  Exh. G.  The sales representatives were not privy to the ingredients that make up the oil nor did they know the formulation or the blending process of the oil.  Exh. G.  When she started working at Industrial Oils, there were only sales representatives and no account representatives.  Exh. G.  There were no territories.  Exh. G.  As a sales representative for Industrial Oils, she would go out and search for companies that she thought used oil (lubes).  Exh. G.  She would drive down streets looking for companies or look through trade books to find potential companies.  Exh. G.  Approximately ninety-eight percent (98%) of her

contacts with companies was from cold calling.  Exh. G.  She was not given any assistance or lists from Industrial Oils.  Exh. G.  Her job was simply to go into a business and ask them whom they used for their oil needs and if they would entertain a quote from Industrial Oils.  Exh. G.  Most of the people she would talk to consisted of purchasing agents, buyers, maintenance supervisors and etc., i.e. anyone that could make the decision to change vendors on their oil needs.  Exh. G.

When you call on companies for their business, you normally can find out what they are currently paying for oil by merely asking them.  Exh. G.  Pricing was not a trade secret and would vary with changes in the market.  Exh. G.  Depending on the client's needs, they could buy oil in transport loads (7500gal), bulk, drums, pails, kegs or tubes.  Exh. G.  There are never any agreements or commitments between the customer and the vendor.  Exh. G.  The companies were not bound to use Industrial Oils.  Exh. G.  They could switch to a new company at any time.  Exh. G.  Sometimes, a client would use several companies for their oil needs, which is common in the oil industry.  Exh. G.  For example, a client may need three types of oil with Industrial Oils providing one type of oil.  Exh. G.  There are situations where Industrial Oils may have an oil needed by a company, but does not do business with the client because the quantity requested is too low.  Exh. G.  However, there are competitors who will sell low quantities to clients.  Exh. G.  In this market, clients are driven by price and service.  Exh. G.

Through out Cynthia Austin's career with Industrial Oils there were many changes.  Exh. G.  As stated above, there were no territories when she started as a sales representative in 1999.  Exh. G.  Eventually, Industrial Oils designated territories for their sales representatives.  Exh. G.  Over her employment with Industrial Oils, she was given several different territories.  Exh. G.  The first territory was East Texas (North of I-20), which consisted of Tyler, Kilgore, Longview, Marshall and

4

a few smaller towns.  Exh. G.  Cynthia Austin worked this territory for approximately 3 years.  Exh. G.  After she developed this territory, Industrial Oils took all of her accounts, commission and money away for this territory and gave it to another employee.  Exh. G.

Cynthia Austin was reassigned to South of the I-20 corridor which consisted of Carthage, Jacksonville, Nacogdoches and Lufkin.  Exh. G.  Industrial Oils made her take over someone else's territory.  Exh. G.  This was a financial gain to Industrial Oils, because Cynthia Austin lost all of her commissions and increased pay in her old territory and did not receive any income in the new territory for the existing accounts.  Exh. G.  She had to bring new business to an existing account, i.e. new product, to receive income on that account.  Exh. G.  She was there until Industrial Oils switched her employment to KFM.  Exh. G.

The jobs at Industrial Oils could be broken down as follows:

(a)    Sales Representatives – Obtained new business and were not privy to ingredients that goes into making the oil, i.e did not know the formulation or the blending process.

(b)    Technical Representatives - Helped with customer on issues concerning equipment, OEM specs, oil sampling etc.  Most technical representative were certified in Machinery Lubrication and Oil Analysis.

(c)    Blenders – Blending the oil from a formulation that was giving to Shreveport office by Tulsa.

(d)    Office Staff – Two ladies in the office in Shreveport that took order from customer over the phone, input order in the system.   Put together quotes for the sales representative.

(e)    Drivers – Delivered oil.

(f)    Managers - Office, Sales and Warehouse.

Exh. G.

Twelve years (2011) later she was asked to sign a Business Protection, Confidentiality and

5

Non-Solicitation Agreement with Industrial Oils (hereinafter referred to as the "Non-Solicitation Agreement"). <u>See</u> Exhibit "A" attached hereto and made a part hereof by reference.

All sales representatives were made to sign a Non-Solicitation agreement. Exh. G. The agreements were placed in each person's inbox at the office with a note to sign it. Exh. G. The agreements were not signed in front of anyone. Exh. G. Once the agreement was signed by the employee, the document was turned over to the receptionist, who forwarded the agreements to Industrial Oils. Exh. G. The Non-Solicitation Agreement was not signed by Industrial Oils and was not notarized until months after the sales representative signed them. Exh. G. They were never notarized in front of the person signing the agreement. Exh. G.

The Non-Solicitation Agreement was prepared by Industrial Oils with the purpose of obligating each party, not just Cynthia Austin, to certain terms and obligations. Exh. G. As prepared by Industrial Oils, there were signature lines for both Industrial Oils and Cynthia Austin. Exh. G. Cynthia Austin and Industrial Oils were required to sign off on the Non-Solicitation Agreement in order to acknowledge their agreements and be bound to their respective obligations contained therein. Exh. G. Thereafter, there was no mention of the Non-Solicitation Agreement until Cynthia Austin was terminated by her subsequent employer, KFM Enterprises, L.L.C. (hereinafter referred to as "KFM"), five years later. Exh. G.

On or about January 1, 2016, the employees were informed in 2016 that they would be working for a new company and that they would have to apply for new jobs. Exh. G. As of January 1, 2016, Cynthia Austin was an employee of KFM. <u>See</u> Exhibit "B" attached hereto and a made a part hereof by reference. The Employee Acknowledgment Form states that "I knowledge that on January 1, 2016, I became an employee KFM, Enterprises, LLC.". Exh. G. CYNTHIA AUSTIN

was informed that all prior job positions and descriptions with Industrial Oil had been terminated and the employees would have to be interviewed for a new job with the new company, KFM Enterprises, LLC (hereinafter referred to as "KFM"). Exh. G. KFM would have new job titles, descriptions and different pay structures. Exh. G. The employees had to interview for a new job or quit. Exh. G. With KFM, Cynthia Austin was forced to take a lower position with different job duties. Exh. G. She was required to maintain existing customers on a list provided by the company. Exh. G. Her hours and pay were substantially reduced by KFM. Exh. G. She could longer sell to new clients. Exh. G. Effectively, she was no longer in a sales representative's position. Exh. G.

In December of 2016, she was released from KFM and was offered a severance package. See Exhibit "C" attached hereto and a made a part hereof by reference. It was at this time that Cynthia Austin discovered that Industrial Oils had not signed or agreed to the original Non-Solicitation Agreement. Exh. G. Considering the detrimental changes in her compensation package and the numerous times Industrial Oils removed her from a profitable territory she created on her own; in hindsight, it was readily apparent that Industrial Oils had no intent to be bound by their agreement. Exh. G. In order to receive the money and health insurance under the Severance Agreement, Cynthia Austin had to acknowledge the validity of the Non-Solicitation Agreement. Exh. G. The Non-Solicitation was referenced in the terms of the Severance Agreement and attached to the Severance Agreement. Exh. G. Furthermore, she had to give up any rights she had to sue KFM or her previous employer. Exh. G. Cynthia Austin did not accept the money or the health insurance, because she did not desire to be bound by the Non-Solicitation Agreement. Exh. G. In order to support herself and her family, she had to find work. Exh. G.

Since she was not bound by the Non-Solicitation Agreement, she accepted employment with

7

Tulstar on December 13, 2016.  See Exhibit "D" attached hereto and a made a part hereof by reference.  Based upon a threatening letter from Industrial Oils, she was terminated by Tulstar on March 24, 2017.  See Exhibit "E" attached hereto and made a part hereof.

Cynthia Austin obtained new employment with Tulstar with a sizable income and benefits. Exh. G.  KFM contacted Tulstar to inform them that Cynthia Austin was under a Non-Solicitation agreement and it was a violation for Cynthia Austin to work for them.  See Exhibit "F" attached hereto and made a part hereof by reference.  As a result of KFM's actions, Tulstar terminated Cynthia Austin's employment.  Exh. G.  Cynthia Austin worked for Tulstar for less than four (4) months with most of this time establishing an office and a system to sell and deliver product to clients.  Exh. G.

On November 9, 2017, Cynthia Austin filed a lawsuit to have the court determine that the Non-Solicitation Agreement was null and void and an award her damages for the following reasons:

(a)     To the extent the Non-Solicitation Agreement was executed, the Agreement is vague and invalid.

(b)     Furthermore, any assignment to a third party is against public policy.

(c)     The Non-Solicitation Agreement which restrains Cynthia Austin from working is not in compliance with Louisiana revised statue under section 23:921.

(d)     There is no specific definition of the employer's business.

(e)     CYNTHIA AUSTIN is prohibited from communicating with, contacting and/or soliciting any individual or company that the defendant might do business within the future, whether or not such individual or company is a client of the defendant.

(f)     CYNTHIA AUSTIN is prohibited from communicating with, contacting and/or soliciting any individual or company in almost every industry that sells, makes or uses oil, grease, cleaners, rust preventatives, chemicals or

8

lubricants for any reason whatsoever. Industrial Oils' motto is that they do "unlimited products" for "unlimited industries". These individuals or companies, include but are not limited to, the neighborhood lawn mowing company, the local farmer, gas stations, chain saw repair shops, construction companies, Wal-Mart, car dealerships, oil field companies, DOTD, manufacturing companies, "mom and pop" companies, welding companies, mining and tree cutting services. This would include any individual or company who uses vehicles, equipment, machinery or any company who services vehicles, equipment, machinery or etc.

(g)     Even if she obtained a job selling long distance telephone services, CYNTHIA AUSTIN is prohibited from contacting any individual or company that the defendant might call on. The Agreement is not in any manner tied to the services she provided to her employer.

(h)     The basis of the non-solicitation agreement is to protect confidential information. There is no confidential information. Any information she had is readily available to the public. Any individual has the ability to call a company and request who they buy their supplies from and for what price. In order to obtain a competitive bid, companies freely give this information out to the public. Furthermore, any pricing information changes on a regular basis based on supply, demand and competition. Any information she has from her employment is no longer relevant. Additionally, the defendant does not protect its confidential information.

(i)     The defendant is claiming they have the right to assign the Agreement to any company it desires to without her consent. Such a transfer could effectively change the scope and restrictions set forth in the Agreement to her detriment. Such a provision is against public policy.

(j)     The listing of states and parishes is too broad.

(k)     The Agreement is so broad, CYNTHIA AUSTIN is prohibited from calling on any individual or company that may be a client of the defendant's in the future.

(l)     The Agreement was never executed by all parties.

Exh. G.

9

## II. **Law and Argument**

A.    Motion for Summary Judgment

Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *United States v. Cytogel Pharma, LLC,* No. CV 16-13987, 2018 WL 4462183, at *3 (E.D. La. Sept. 17, 2018). An issue is material if its resolution could affect the outcome of the action. *Id.* When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence. *Id.* All reasonable inferences are drawn in favor of the non-moving party. *Id.* There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party, thus entitling the moving party to judgment as a matter of law. *Id.* A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.

To satisfy Rule 56 burden of production, the moving party must do one of two things: (a) the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim" or (b) he moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.* If the moving party fails to carry this burden, the motion must be denied. *Id.* If the moving party successfully carries this burden, the burden of production then shifts to the non-moving party to direct the Court's attention to something in the pleadings or other evidence in the record setting forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist. *Id.*

10

If the dispositive issue is one on which the non-moving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the non-movant's claim, or (2) affirmatively demonstrating that there is no evidence in the record to establish an essential element of the non-movant's claim. *Id.* If the movant fails to affirmatively show the absence of evidence in the record, its motion for summary judgment must be denied. *Id.* Thus, the non-moving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party. Unsubstantiated assertions are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Id.* Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. *Id.*

B.      Louisiana Law on Non-Solicitation Agreements

Louisiana law takes a dim view on those trying to restrain business and has enacted its laws to state that "[e]very contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void." La. R.S. § 23:921(A)(1)(West 2017). Therefore, we start out with the proposition that all Non-Solicitation agreements are null and void. *Waguespack v. Medtronic*, 185 F.Supp.3d 916 (M.D. La. 2016). Thus, non-competition agreements are unenforceable unless they fit within one of the statute's narrow exceptions. *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 808 So.2d 294, 298 (La.2001). The exception relevant to this case is contained within § 921(C), which provides: "Any person ... who is employed as an ... employee may agree with his employer to refrain

11

from … soliciting customers of the employer within a specified parish or parishes ... so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment." 185 F.Supp.3d at 928-929 (emphasis added). The purpose of the statute is to allow the employee to know on the front end what his potential restrictions might be and what price he was being called upon to pay in exchange for employment. *Id.*

In determining the fundamental policy of Louisiana, the history of covenants not to compete, and their enforcement, in Louisiana is instructive. "A contract or agreement which prohibits an employee from competing with a former employer consistently has been found to be against public policy in Louisiana." *Water Processing Technologies, Inc. v. Ridgeway*, 618 So. 2d 533, 535 (La. 1993) (citing *Kearney and Co., Inc. v. Rellstab*, 593 So. 2d 741, 747 (La. App. 4th Cir. 1992) ). The legislative history of section 23:921 reveals an intent in Louisiana to favor the employee over the employer in enforcing these agreements. The Water Processing Court explained:

> The legislative enactment of the policy in 1934 as § 23:921 was modified first in 1962 to allow enforcement of limited non-competition agreements for those employers incurring an expense in the training of the employee or in advertising the employee's association with the business. In 1989, this single exception was replaced, as detailed above, to permit non-competition agreements between [a variety of business relationships]. In each statutory scheme, however, any exception to the prohibition against non-competition agreements has been specifically restricted in time, and generally, geographical area.

Cases which have interpreted the current law have held that "public policy requires that covenant not to compete agreements 'must be strictly construed in the employee's favor.'"618 So. 2d at 536

12

(citing *Daiquiri's III On Bourbon, Ltd. V. Wandfluh*, 608 So. 2d 222, 224 (La. App. 5th Cir. 1992, quoting *Jon Bet & Associates v. Tyer*, 550 So. 2d 673, 675 (La. App. 2nd Cir. 1989) ) ) (emphasis added). *Bruckner Truck Sales, Inc. v. Bayou Diesel Servs., LLC,* No. 2:17-CV-0204, 2017 WL 10152283, at *7–8 (N.D. Tex. Nov. 21, 2017), report and recommendation adopted, No. 2:17-CV-204-J, 2018 WL 4076478 (N.D. Tex. Jan. 5, 2018). As a starting point, such a covenant is null and void, unless it can fit into one of the narrow statutory exceptions. Id. Louisiana law does not authorize reformation; however, the Court can strike any unenforceable language. See *Vartech Sys. v. Hayden*, 951 So. 2d 247, 256 (La. App. 1st Cir. 2006) (excise [of] the offending language from the non-compete clause without doing undue damage to the remainder of the provision [is allowed] ).

C.      The Validity of the Non-Solicitation Agreement outside of 23:921

A non-solicitation agreement is a contract between the parties who enter it, and it is to be construed according to the general rules of contract interpretation. *Brock Services, L.L.C., v. Rogillio*, 2019 WL 4023825 (5th Cir. 2019); *Reg'l Urology, L.L.C. v. Price*, 42,789 (La. App. 2 Cir. 9/26/07), 966 So. 2d 1087, 1091–92, writ denied, 2007-2251 (La. 2/15/08), 976 So. 2d 176 *SWAT 24*, supra. Under Louisiana Civil Code Article 1906, a contract is an agreement between two or more parties whereby obligations are created, modified or extinguished. This is a bilateral contract under Louisiana Civil Code Article 1908 in that it obligates each party to reciprocal obligations, i.e. each party is bound to the other. Louisiana Civil Code Article 1927 and 1947 states that when the parties prepare a document requiring the execution of each party by their signatures; the parties must sign and execute the agreement in order to have a valid contract. Not only was this the intent of the form, but Industrial Oils prepared the form and failed to comply with it own requirements.

13

The common intent of the parties is used to interpret a contract. La. C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. When a contract may be interpreted from the four corners of the agreement, without consideration of extrinsic evidence, the interpretation is a matter of law. *ScenicLand Construction Co., L.L.C. v. St. Francis Medical Center, Inc.*, 41,147 (La.App.2d Cir.7/26/06), 936 So.2d 251; *NAB Natural Resources, L.L.C. v. Willamette Industries, Inc.*, 28,555 (La.App.2d Cir.8/21/96), 679 So.2d 477.

In 1999, Cynthia Austin was hired as a sales representative for Industrial Oils. Exh. G. As the sales representative, her job was to obtain new business. Exh. G. As a sales representative for Industrial Oils, she would go out and search for companies that she thought used oil (lubes). She would drive down streets looking for companies or look through trade books to find potential companies. Approximately ninety-eight percent (98%) of her contacts with companies was from cold calling. She was not given any assistance or lists from Industrial Oils. Her job was simply to go into a business and ask them whom they used for their oil needs and if they would entertain a quote from Industrial Oils. Though out Cynthia Austin's career with Industrial Oils there were many changes. As stated above, there were no territories when she started as a sales representative in 1999. Eventually, Industrial Oils designated territories for their sales representatives. Over her employment with Industrial Oils, she was given several different territories. The first territory was East Texas (North of I-20), which consisted of Tyler, Kilgore, Longview, Marshall and a few smaller towns. Cynthia Austin worked this territory for approximately 3 years. After she developed this territory, Industrial Oils took all of her accounts, commission and money away for this territory and gave it to another employee.

14

Cynthia Austin was reassigned to South of the I-20 corridor which consisted of Carthage, Jacksonville, Nacogdoches and Lufkin. Industrial Oils made her take over someone else's territory. This was a financial gain to Industrial Oils, because Cynthia Austin lost all of her commissions and increase pay in her old territory and did not receive any income in the new territory for the existing accounts. She had to bring new business to an existing accounts, i.e. new product, to receive income on that account.

Twelve years (2011) after she was employed, she was asked to sign a Business Protection, Confidentiality and Non-Solicitation Agreement with Industrial Oils (hereinafter referred to as the "Non-Solicitation Agreement"). Exh. A. All sales representatives were made to sign a Non-Solicitation agreement. The agreements were not signed in front of anyone. Once the agreement was signed by Cynthia Austin, the document was turned over to the receptionist, who forwarded the agreements to Industrial Oils. The Non-Solicitation Agreement was not signed by Industrial Oils and was not notarized until months after the Cynthia Austin signed. The agreement was not notarized when Cynthia Austin signed.

The Non-Solicitation Agreement was prepared by Industrial Oils with the purpose of obligating each party, not just Cynthia Austin, to certain terms and obligations. Exh. A. Among other obligations, Industrial Oil was to employ Cynthia Austin as a Sale Representative at her then income. Exh. A. As prepared by Industrial Oils, there were signature lines for both Industrial Oils and Cynthia Austin. Exh. A. Cynthia Austin and Industrial Oils were required to sign off on the Non-Solicitation Agreement in order to acknowledge their agreements and be bound to their respective obligations contained therein. Exh. A. Thereafter, there was no mention of the Non-Solicitation Agreement until Cynthia Austin was terminated by her subsequent employer, KFM,

15

Enterprises, L.L.C. (hereinafter referred to as "KFM"), five years later.  Exh. G.

On or about January 1, 2016, the employees were informed in 2016 that they would be working for a new company and that they would have to apply for new jobs.  Exh. B.  As of January 1, 2016, Cynthia Austin was an employee of KFM.  Exh. B.  The Employee Acknowledgment Form states that "I knowledge that on January 1, 2016, I became an employee KFM, Enterprises, LLC."  Exh. B.  What is important is that she only acknowledged the "policies and procedures" of Industrial Oils were being adopted by KFM.  Exh. B.  The polices and procedures of a company would not cover a non-solicitation agreement.  Exh. B.  In further support of this position, the form states that KFM has the ability in its sole discretion to alter the policies and procedures.  KFM definitely does not have the authority to modify a non-solicitation agreement.  Exh. B.  Nowhere in the form does it mention a non-solicitation agreement.

CYNTHIA AUSTIN was informed that all prior job positions and descriptions with Industrial Oil had been terminated and the employees would have to be interviewed for a new job with the new company, KFM Enterprises, LLC (hereinafter referred to as "KFM").  Exh. G.  KFM would have new job titles, descriptions and different pay structures.  Exh. G.  The employees had to interview for a new job or quit.  Exh. G.  With KFM, Cynthia Austin was forced to take a lower position with different job duties.  Exh. G.  She was required to maintain existing customers on a list provided by the company.  Exh. G.  Her hours and pay was substantially reduced by KFM.  Exh. G.  She could longer sell to new clients.  Exh. G.  Effectively, she was no longer in a sales representative's position.  Exh. G.

In December of 2016, she was released from KFM and was offered a severance package.  Exh. C.  It was at this time that Cynthia Austin discovered that Industrial Oils had not signed or

16

agreed to the original Non-Solicitation Agreement.  Exh. C.  Considering the detrimental changes in her compensation package and the numerous times Industrial Oils removed her from a profitable territory she created on her own; in hindsight, it was readily apparent that Industrial Oils had no intent to be bound by their agreement.  Exh. G.  In order to receive the money and health insurance under the Severance Agreement, Cynthia Austin had to acknowledge the validity of the Non-Solicitation Agreement.  Exh. C.  The Non-Solicitation was referenced in the terms of the Severance Agreement and attached to the Severance Agreement.  Exh. C.  Furthermore, she had to give up any rights she had to sue KFM or her previous employer.  Exh. G.  Cynthia Austin did not accept the money or the health insurance, because she did not desire to be bound by the Non-Solicitation Agreement.  Exh. G.  In order to support herself and her family, she had to find work.  Exh. G.

As drafted by Industrial Oils, one of the considerations in the Non-Solicitation Agreement was that Cynthia Austin would remain as a Sales Representative at her then existing pay structure. Exh. A.  This was Cynthia Austin's primary obligation in entering into the agreement. Industrial Oils attempted to get around this agreement by assigning their rights to KFM, who would than substantially modify her position and pay structure to her detriment.   The Non-Solicitation was clearly breached by Industrial Oils and stopped to exist when she was assigned to KFM.

D.    Paragraph 3 Non-Disclosure of Confidential Information is null and void under Louisiana Revised Statute § 23:921.

Among other things, Section 3 of the Non-Solicitation Agreement provides that "Employee agrees not to use or disclose the Company's Confidential Information for his/her benefit, or for the benefit of anyone other than the Company at any time during or after his/her employment with the Company without the Company's express prior written consent."  In getting Cynthia Austin fired

17

from her job, KFM states in a letter to her and her new employer that this specific language prevents her from soliciting KFM's clients. See Exhibit "A" attached hereto and made a part hereof by reference. KFM did not give Cynthia Austin permission to contact their client. The lawyers for KFM explains that Cynthia Austin using her knowledge of the company's client to solicit business is exactly what this Section 3 of the Non-Solicitation Agreement is designed to prevent.

Louisiana Revised Statute § 23:921(C) states that any attempt by an employer to prevent an employee from soliciting customers of the employer must contain the following: (a) limits the agreement to a specified parish or parishes, municipality or municipalities, or parts thereof, (b) requires the employer to carry on a like business therein, and (c) the restriction may not exceed a period of two years from termination of employment. Confidentiality Agreements have been held to be in effect a Non-Solicitation Agreement as a result of their wording. *O'Sullivan v. Sunil Gupta, M.D., LLC,* No. CV 17-609, 2017 WL 3438349, at *4 (E.D. La. Aug. 10, 2017). Section 3 of the Non-Solicitation Agreement is null and void because there are no geographical or time limitations applicable to Section 3. *Bruckner Truck Sales, Inc. v. Bayou Diesel Servs.*, LLC, No. 2:17-CV-0204, 2017 WL 10152283, at 9 (N.D. Tex. Nov. 21, 2017), report and recommendation adopted, No. 2:17-CV-204-J, 2018 WL 4076478 (N.D. Tex. Jan. 5, 2018). Such omission is fatal to the non-solicitation clause. *Id*. This portion of the Agreement may not be reformed by striking out language. *Id*. at 9-10. Louisiana law makes a distinction between removing language from a non-solicitation clause and adding language or rewriting the clause to make it comply with § 23:921(C).

E.    The Non-Solicitation Agreement is null and void because the Agreement is overly broad and ambiguous when it extends to other parties not part of the Agreement.

In Section 5(a) of the Non-Solicitation Agreement, Cynthia Austin may not directly or

18

indirectly, call upon, contact or communicate with, solicit, contract with, or enter into any agreement with, divert or attract, or attempt to do so, or do or accept business with any current or former customer, client or prospect of the Company *or any of the Company's parent, subsidiary, affiliated, or otherwise related entities.* In Section 5(b), the geographical and time limitations only apply to the Company. The geographical and time limitations required under § 23:921(C) do not apply to any of the Company's parent, subsidiary, affiliated, or otherwise related entities. This fact alone makes the Non-Solicitation Agreement null and void.

In Section 6 of the Non-Solicitation Agreement Company states that the "Company may assign its rights under this agreement at any time." Under this provision the Company is allowed to assign this contract to <u>anyone</u>. The Non-Solicitation Agreement places no restrictions or limitations whatsoever on who the Non-Solicitation Agreement may be assigned to by the Company. A non-competition agreement is over broad and ambiguous if it seeks to restrict competition to affiliates of the employer. *All American Healthcare, LLC and Dichiara*, 263 So.3d 922 (La. Ct. App. 5th Cir. 2018); *Henderson Implement Co., Inc. v. Langley*, 707 So. 2d 482 (La. Ct. App. 3d Cir. 1998); *Cable & Connector Warehouse, Inc. v. Omnimark, Inc.*, 700 So. 2d 1273 (La. Ct. App. 4th Cir. 1997); *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 670 S.E.2d 321 (2009) (non-competition including "any parent, division, subsidiary, affiliate, predecessor, successor, or assignee" of employer over broad). Non-Solicitation agreements are generally not assignable in Louisiana because such agreements may only be between the then current employer and employee. R.S. 23:921(C); *Jeansonne v. El Hindy*, 413 So. 2d 999 (La. Ct. App. 4th Cir. 1982), but see *Louisiana Office Systems, Inc. v. Boudreaux*, 298 So. 2d 341 (La. Ct. App. 3d Cir. 1974) (employer sole proprietor who later incorporated). Furthermore, employment contracts are personal and not

19

assignable by either the employee or the employer.  C.C. art. 1765, 1766, 1984; *Jeansonne v. El Hindy*, 413 So. 2d 999 (La. Ct. App. 4th Cir. 1982); *Thomas v. McCrery*, 147 So. 2d 467 (La. Ct. App. 2d Cir. 1962).

The purpose of the limitation set forth under § 23:921(C) is to allow the employee to "know on the front end what his potential restrictions might be and exactly what price he was being called upon to pay in exchange for employment." *Aon Risk Servs. of La., Inc. v. Ryan*, 807 So.2d 1058, 1062 (La.Ct.App. 4th 2002) (invalidating a non-competition clause which covered " 'whatever parishes, counties and municipalities the Company or Hall'... conducted business"); see, e.g., *Johnson Controls, Inc. v. Guidry*, 724 F.Supp.2d 612, 622 (W.D.La. July 12, 2010) ("Not only does the clause fail to specifically list the parishes that it covers, it also fails to reference or list any other data from which its geographical scope could be determined."); *Action Revenue Recovery, L.L.C. v. eBusiness Grp., L.L.C.*, 17 So.3d 999, 1003 (La.Ct.App. 2d Cir.2009) (rejecting a noncompetition clause which applied "to all parishes or counties ARR/FAC covers on a like business in said parishes or counties"); *Waguespack v. Medtronic, Inc.*, 185 F. Supp. 3d 916, 929 (M.D. La. 2016).  An employee is unable on the "front end" to know the scope of his Non-Solicitation agreement if the Company has the right to include any parent, division, subsidiary, affiliate, predecessor, successor, or assignee of the Company.  One simple transfer to another company could completely change the boundaries of the Non-Solicitation including what is a "similar business".

As in this case, Cynthia Austin's prior company assigned her Non-Solicitation to a new company with different job descriptions and pay structures.  The assignment occurred on January 1, 2016 approximately five (5) years after she signed the Non-Solicitation agreement.  See Exhibit "A" attached hereto and made a part hereof by reference.  This assignment completely changed her

pay structure and job descriptions and she was ultimately let go from her position.  When she signed the Non-Solicitation Agreement, she was promised a certain job and pay structure.  Had she known that her income would be significantly reduced and her job would no longer exist by assigning her to a new company was coming, she would have not signed the Non-Solicitation agreement and searched for new employment.  The Non-Solicitation Agreement is null and void.

F.    The definition of Company's business is overly broad.

Under the facts of this case, the Non-Solicitation Agreement is unenforceable because it does not provide a specific definition of Industrial Oils' business.  Louisiana appellate courts are split on whether a non-competition or non-solicitation agreement requires a specific definition of the employer's business, and the courts' analyses are heavily fact intensive.  See *Paradigm health Sys., L.L.C. v. Faust*, 2016-1276, 2017 WL 1379096 (La. App. 1 Cir. 4/12/17); *LaFourche Speech & Language Servs., Inc. v. Juckett*, 1994-1809 (La. App. 1 Cir. 3/3/95), 652 So.2d 679, *writ denied*, 1995-0850 (La.. 5/1/95), 654 So.2d 351; *Daiquiri's III on Bourbon, Ltd. V. Wandfluh*, 608 So.2d 222 (La. App. 5 Cir. 1992), *writ denied*, 610 So.2d 801 (La. 1993).  The Second Circuit also has conflicting opinions on whether the lack of a specific definition of the employer's business makes such an agreement too broad and in violation La. R.S. 29:921(C).  See *Summit Inst. For Pulmonary Med. And Rehabilitation, Inc. v. Prouty*, 29,829 (La. App. 2 Cir. 4/9/97), 691 So.2d 1384, *writ denied*, 97-1320 (La. 9/26/97), 701 So.2d 983; *Ticheli v. John H. Carter Co., Inc.*, 43,551 (La. App. 2 Cir. 9/17/08), 996 So.2d 437.

In *Ticheli*, the court cites *Baton Rouge Computer Sales, Inc. v. Miller-Conrad*, 1999-1200 (La. App. 1 Cir. 5/23/00), 767 So.2d 763, for the proposition that the law does not require a specific definition of the employer's business.  996 So.2d at 440.  However, in *Baton Rouge Computer Sales*,

the employer's only business in that case was computer sales.  In the instant case, Ms. Austin's agreement restricts her from engaging in any type of sales rather than the specific type of sales she performed while employed with Industrial Oils.  This blanket prohibition is overly broad, and there is a strong public policy not to lock former employees out of their ability to earn a living.  See *Ticheli*, 996 So.2d at 441 (Brown, C.J., concurring).

Non-competition agreements are strictly construed in favor of the employee and against a party attempting enforcement, like Industrial Oils.  Non-competition clauses that contain overly broad definitions of the employer's business violate La. R.S. 23:921(C) and are null and void.  It is not sufficient to merely prohibit an employee from engaging in a business similar to the employee. *Faust*, 2017 WL 1379096, at *3 (citing *Juckett*, 652 So.2d at 680-81).  Furthermore, an "employer is not entitled to keep ex-employees from being able to make a living in any segment of the ex-employer's industry." *Id*.  (Citing *Vartech Systems, Inc. v. Hayden*, 05-2499 (La. App. 1 Cir. 12/20/06), 951 So.2d 247, 259 n. 15).

In this industry, there are never any agreements between the customer and the vendor. Businesses are not obligated to use one oil company.  A company could use a completely different oil company on their next purchase.  Sometimes businesses would use several companies for their oil needs, which is common in the oil industry.  For example, ABC Company may buy engine oil from Industrial Oils and hydraulic oil from Lott Oil and grease from Auto Zone.  Purchasing departments are very well known for shopping around for price.  ABC Company could shop price for all of their oil products and not ever use the same company twice. An agent of Industrial Oils could have called on a particular company, but has still not sold a product because of size or pricing issues.  Industrial Oils only sells in large quantities leaving the smaller companies available for other

distributers.  Often times, a client might fall into Industrial Oils' prospective client's list, but only use Mobil Oil, does the solicitation of this client violate a Non-Solicitation agreement.

In *Louisiana Smoked Prod., Inc. v. Savoie's Sausage & Food Prod., Inc.*, the Louisiana Supreme Court stated that the statute's original purpose was "to protect employees and prevent them from contracting away there right to future employment[, and] . . . coverage was judicially extended to other classes of people who have uneven bargaining power.  696 So.2d 1373, 1381 (1997).  The Covenant Not to Solicit Customers listed in Section 5(a) states the following:

> Employee covenants and agrees that he/she will not, directly or indirectly, call upon, contact or communicate with, solicit, contract with, or enter into any agreement with, diver, or attract, or attempt to do so, or do or accept business with any current or former customer, client or prospect of the Company or any of the Company's parent, subsidiary, affiliated, or otherwise related entities.

Section 5(b) states provides the following:

> The restrictions of this Paragraph 5 are effective within the specified parishes/counties listed in Exhibit "A" to this Agreement (which are parishes/counties where the Company actually carries on or perform business, work, or services and/or solicits clients, customers, prospective clients, or prospective customers) . . . .

The Non-Solicitation agreement with Industrial Oils is unenforceable as it restricts her from participating in any type of sales without limitation.  These are sales that would not directly compete with Industrial Oils.  Furthermore, the mere phone call to a purchasing agent by Industrial Oils would prevent Cynthia Austin from soliciting the company for business whether related or not to the business of Industrial Oils.  This agreement restricts her from selling more than which she was hired to sell by Industrial Oils.  Based on the industry and the language in the Non-Solicitation Agreement, it is impossible to determine who she can and can't sell to under the agreement.  As the prohibitions cannot be determined due to the lack of a definition of Industrial Oils' business, the instant

23

agreement does not comply with La. R.S. 23:921(C), and the entirety of it is invalid and unenforceable.  <u>See</u> *Faust*, 2017 WL 1379096, at *5.

### III.  <u>Conclusion</u>

As a matter of law, the Non-Solicitation Agreement is not null and void under Louisiana Revised Statutes 23:921 and basic contract law.  Without rewriting the agreement, the Non-Solicitation Agreement cannot be saved.  It is the position of Cynthia Austin that there is no need to determine any other issues raised in Movants' Motion for Summary Judgment.

WHEREFORE, CYNTHIA AUSTIN moves that the Motion for Summary Judgment be denied for the reasons set forth herein.

FURTHER PRAY for all other general and equitable relief.

> Respectfully submitted,
> KAMMER & HUCKABAY, LTD (A.P.L.C.)
> /s/ Charles H. Kammer, III
> **CHARLES H. KAMMER, III**
> LSBA No. 21658
> 820 Jordan Street, Suite 480
> Shreveport, Louisiana  71101
> 318-222-0293 - Telephone
> 318-425-1644 - Facsimile
> Pete@KandHLawOffice.com
> ATTORNEY FOR CYNTHIA AUSTIN

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing was filed with the United

States District Court for the Western District of Louisiana by electronic case filing/case

management. Notice of this filing will be sent to all counsel of record by operation of the

electronic case filing system.

Elizabeth Mendell Carmody
333 Texas Street, Suite 1700
P.O. Box 22260
Shreveport, Louisiana 71120-2260
Shreveport, Louisiana, this 23rd day of September, 2019.

/s/ Charles H. Kammer, III
Charles H. Kammer, III

25